[No. 39064. Department One. December 28, 1967.]

THE STATE OF WASHINGTON, *Respondent*, v. DANIEL PATTON KRAMER, *Appellant.**

*W. Delmore McDowell*, for appellant (appointed counsel for appeal).

*Robert E. Schillberg, Bruce E. Jones*, and *Allen J. Hendricks*, for respondent.

OTT, J.†—February 7, 1966, Daniel Patton Kramer (being then nearly 18 years of age), was charged as a delinquent

*Reported in 435 P.2d 970.

†Judge Ott is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

child in the Juvenile Court for Snohomish County with the homicide of Officer Donald Arndt of the Marysville Police Department on February 5, 1966. Daniel Patton Kramer, after the homicide, fled from his home where the act had been committed, to the residence of his high school counselor. He told his counselor of the homicide and that it was accidental. They returned to Daniel Patton Kramer's home whereupon he was arrested. He was then told that he need not make any statements, that he had a right to have a lawyer represent him, and if he made a statement it could be used against him. Daniel Patton Kramer stated that he understood these rights. At the sheriff's office, after talking with the officers for some time, he signed a document in which he stated, *inter alia*, that he had accidentally shot Officer Arndt. He was not then represented by an attorney, and his only living parent, his mother, was in California. After the statement was signed he was taken to the juvenile detention center.

February 8, 1966, an application for Kramer's involuntary commitment to Northern State Hospital for the mentally ill was filed in the superior court. A warrant to forthwith apprehend him was issued. February 9, 1966, a hearing was had on the commitment petition and an order was entered committing Daniel Patton Kramer to Northern State Hospital for detention and observation "for the purpose of obtaining testimony as to the alleged mentally ill person's condition and treatment . . . and the said Daniel Patton Kramer is committed thereto, for a period not exceeding sixty (60) days for such detention."

April 1, 1966, the superintendent of Northern State Hospital executed an "Official Notice" directed to Daniel Patton Kramer's mother as follows:

NORTHERN STATE HOSPITAL      Sedro-Woolley, Wash.
Office of the Superintendent      April 1, 1966

This is to inform you of the discharge from Court Order Observation (without psychosis) on April 1, 1966 of Daniel P. Kramer #425508 (Returned to Sheriff, Snohomish County) who was admitted February 6, 1966 by an

order of the Superior Court of Snohomish # 1964 County.

Mrs. Virginia Peterson (Mother)
1631-3rd Street
Marysville, Washington

Very truly yours,
/s/ William D. Voorhees, Jr.
Superintendent.

On April 1, 1966, 18 days after Daniel Patton Kramer's 18th birthday, the Snohomish County prosecuting attorney filed an information in the superior court charging him with murder in the first degree. Daniel Patton Kramer entered a plea of not guilty and a special plea that he was not guilty by virtue of temporary insanity and mental irresponsibility at the time of the homicide, but that he had since recovered. (The latter plea was withdrawn at the time of trial.)

April 4, 1966, the juvenile court proceedings were dismissed. The court's order read in part: "It now appearing to the Court that the said child has become eighteen years of age on March 13, 1966 and that no useful purpose would be served by bringing said child into Juvenile Court for Snohomish County."

April 13, 1966, the superior court entered an order granting the defendant's request for a change of venue for trial. The cause was ordered transferred to the Superior Court for Skagit County.

June 1, 1966, pursuant to Rule of Pleading, Practice and Procedure 101.20W, a hearing was had on the question of the voluntariness of Kramer's written statement. The court, after analyzing the testimony of each witness, held that the statement was voluntarily made by Daniel Patton Kramer after he had been fully advised of his constitutional rights. The court ruled the statement was, nevertheless, inadmissible because of *Harling v. United States*, 295 F.2d 161 (D.C. Cir. 1961). June 6, 1966, the cause was tried to a jury which returned a verdict of "guilty of the crime of Murder in the Second Degree, . . . ." From the entry of judgment and sentence based upon the jury verdict, Daniel Patton

Kramer has appealed. The attorney who represented him from February 8, 1966, through the trial of the cause does not represent him on appeal.

■ ·Appellant first assigns error to the juvenile court's relinquishment of its jurisdiction without affording appellant a hearing on the propriety of its relinquishment. During his tenure at Northern State Hospital for observation any other pending proceeding was stayed. At the time appellant was released from his commitment for observation to Northern State Hospital he had arrived at the age of 18 years. When a juvenile cause is pending and not heard on its merits prior to the time the juvenile reaches 18 years of age, the juvenile court loses jurisdiction over the cause. *State v. Ring,* 54 Wn.2d 250, 339 P.2d 461 (1959); see also *In re Lesperance, ante* p. 572, 434 P.2d 602 (1967); *In re Dillenburg v. Maxwell,* 70 Wn.2d 331, 422 P.2d 783 (1967).

Appellant next assigns error to the trial of the cause on its merits in the adult court while the mental illness inquiry was pending. Daniel Patton Kramer was committed for observation and examination. The order of release (without psychosis) executed by the superintendent of Northern State Hospital terminated the hospital's examination and observation. After Daniel Patton Kramer was released by the superintendent of the hospital to the custody of the sheriff there was no pending mental illness proceeding. The information was thereafter filed. We find no merit in this assignment of error.

Appellant next asserts that the trial court erred in permitting the appellant's signed statement to be used for purposes of impeaching appellant's testimony and to be thereafter admitted as an exhibit and read to the jury. At the pretrial hearing on June 1, 1966, the trial court found that the statements made by appellant to the officers were voluntary and were made after appellant had been advised of and had understood his constitutional rights. The trial court at that time, applying the rule of *Harling v. United States, supra,* held the confession was not admissible in this adult criminal proceeding because the written statement

was taken by the officers while the juvenile proceeding was pending and the accused was subject to the jurisdiction of the juvenile court.

When the appellant became a witness in his own behalf in the adult trial, on direct examination, he testified to the fact that he had signed a statement that the shooting had been accidental. He testified in this regard as follows:

Q. After you got to the Snohomish County Sheriff's Office, what happened? A. They took me into the room and they said that they were going to take some statements from me and they proceeded to take the statements. . . . Q. What did they ask you when they got up in that room? A. They asked me to tell what had happened. They asked me questions, oh I don't remember the exact questions. I had one purpose in mind, and that was to convey to them that it was an accident. A lot of it I didn't remember. My mind, it just wasn't working right. It just — Q. All right. What did they ask you about what happened upstairs, how did they put it to you? A. They asked me questions such as I had a gun, what was I going to do with it, things like that. Q. All right. What did you tell them? A. I told them that — oh, I don't think I told them — The statements are not clear, and the only thing I can remember about the whole thing, is trying to make them know it was an accident. Q. Did you say anything more specifically, in that effort? A. I told them that I felt that they needed an explanation, because the things I didn't know or couldn't remember which was then most of it; there were spots I could remember, but it was jumbled. I felt that they needed an explanation. . . . Q. Go on with your explanation you told that night. A. I knew they wanted an explanation as to what had happened, and I wasn't sure what had happened. I wanted to be helpful as much as possible, because I felt they would be working for my good. So that I told them — I was, you see I didn't know why I picked up the gun, and I told them I picked it up to scare him with this, because I had no reason, or knew why I picked it up because I didn't even know who he was. I just felt that they needed the explanation. Q. O.K. Did they ask you anything about drinking, or do you remember? A. I don't remember. Q. Do you remember the date they asked you to write the statement, or did they write it, at the time? A. No, they wrote it. Q. Well

then, did you check it over and sign it, or something? A. They told me to read it, and I read it, and they told me to sign it and I signed it.

On cross-examination the prosecuting attorney questioned appellant as to other relevant statements in the written document, some of which the appellant denied were contained therein. The written statement was admitted into evidence and read to the jury (without objection). Appellant contends that the rule announced in *Harling, supra,* forbids its use for all purposes. We do not agree. It was held in *Harling* that a statement taken by the officers from a juvenile while juvenile proceedings were pending, could not be introduced into evidence in the prosecution's case in chief in an adult criminal proceeding after the juvenile court had relinquished its jurisdiction thereto. The rationale of the opinion was predicated upon principles of fundamental fairness which operate to make such statements inadmissible in a later adult proceeding. The court said in the *Harling* case, *supra,* at 163:

It would offend these principles to allow admissions made by the child in the non-criminal and non-punitive setting of juvenile proceedings to be used later for the purpose of securing his criminal conviction and punishment. Such a practice would be tantamount to a breach of faith with the child, since he cannot be charged with knowledge of either his privilege against self-incrimination or the Juvenile Court's power to waive its jurisdiction and subject him to criminal penalties. (Footnote omitted.)

■ In *Riddick v. United States,* 326 F.2d 650, 652 (D.C. Cir. 1963), The same United States Court of Appeals for the District of Columbia, interpreting its *Harling* decision as it related to a circumstance similar to the one at bar said:

We are asked to reverse this conviction because of the prejudice to appellant resulting from the admission of appellant's conversation with the police officer at the time of arrest. But it was the defense who first sought to get these conversations into evidence . . . .

In *Harling* we recognized that there are limitations upon the use by the prosecution of admissions obtained from a juvenile by interrogation during police detention prior to waiver of jurisdiction by the Juvenile Court. But we do not read *Harling,* even if it be applicable to the circumstances here involved, as prohibiting the defense from using, or inviting the use, of conversations with the police, which it believes may be helpful in establishing innocence. If its expectations in this regard are not realized, that is surely no ground for reversing the personally disappointing result of conviction.

In the case at bar, as in *Riddick, supra,* at 652, it was the appellant "who first sought to get these conversations into evidence . . . [so as to] give credence to appellant's defense." The *Riddick* rationale is also the rule in this jurisdiction. In *State v. Burgess,* 71 Wn.2d 617, 619, 430 P.2d 185 (1967), we said:

When a defendant in a criminal proceedings refers to a prior written statement on his direct examination, which statement has been found to be voluntary, he thereby waives any right to object to the use of the statement by the prosecution during cross-examination.

And in *State v. West,* 70 Wn.2d 751, 754, 424 P.2d 1014 (1967), we said:

Where one party has introduced part of a conversation the opposing party is entitled to introduce the balance thereof in order to explain, modify or rebut the evidence already introduced insofar as it relates to the same subject matter and is relevant to the issue involved. This is true though the evidence might have been inadmissible in the first place. 22A C.J.S. *Criminal Law* § 660(c) at 655.

■ The trial court, in the pretrial hearing noted above, found from the evidence that appellant's statements were voluntarily made. This finding by the trial court upon appellate review is subject to the following rule this court announced in *State v. Hoffman,* 64 Wn.2d 445, 451, 392 P.2d 237 (1964):

[A]lthough we will and do attach significant weight to findings of fact upon disputed issues arising under Rule 101.20W, *supra,* we cannot blindly and conclusively ac-

cept such as indisputably establishing the pertinent facts. It is our duty and obligation, where basic constitutional rights are involved, to carefully review the record brought before us and determine therefrom whether the bounds of due process requirements have been exceeded. *Haynes v. Washington, supra* [373 U.S. 503, 10 L. Ed. 2d 513, 83 Sup. Ct. 1336 (1963)]; *State v. Rutherford,* 63 Wn. (2d) 949, 389 P. (2d) 895.

Our review of the facts establishes that appellant was nearly 18 years old; that he held several odd jobs; that he was a senior in high school; that he was advised of his constitutional rights that he need not make a statement, that he could remain silent, that statements he made could be used against him, that he could have counsel appointed, and that he could have access to a telephone. He admitted on direct examination that he had been so advised on three occasions and that he fully understood the import of these rights prior to making his statements to the law enforcement officers. There is no evidence of any overreaching or coercion. Appellant testified that the officers who interrogated him were fair. We agree with the trial court that appellant's statement here in question was voluntarily made. We conclude that it was "not coerced or suggested, . . . [and] was not the product of ignorance . . . adolescent fantasy, fright or despair." (Footnote omitted.) *In re Gault,* 387 U.S. 1, 55, 18 L. Ed. 2d 527, 87 Sup. Ct. 1428 (1967).

Finally, appellant contends that the trial court erred in making and entering judgment and sentence of conviction. We have not detailed the events which occurred the night of February 4, 1966; the acquisition of a fifth of vodka; the consumption of a part of it by the appellant a few hours before the homicide on February 5, 1966; the acquisition of shotgun shells by appellant; the actual loading of the weapon; appellant's pretending to his sister that he intended to commit suicide; appellant's sister telephoning Officer Arndt which led to his coming to appellant's residence; Officer Arndt's ascension of the stairs; his entering appellant's room, and the almost instantaneous firing of the weapon at

close range causing his death. We have not detailed the contents of appellant's statement nor the testimony of witnesses. The homicide was admitted. Appellant's sole defense was that he killed Officer Arndt accidentally. There was ample evidence, if believed by the jury, to sustain each and every one of the elements of second degree murder. The court did not err in entering judgment and sentence predicated upon the verdict of the jury.

We have considered appellant's remaining assignments of error and find them to be without merit.

Judgment is affirmed.

FINLEY, C. J., HILL, ROSELLINI, and HALE, JJ., concur.

February 29, 1968. Petition for rehearing denied.