**Herman RANDALL, Petitioner,**

v.

**Dr. George BETO, Director, Texas Department of Corrections, and Clarence Jones, Sheriff, Dallas County, Texas, Respondents.**

**No. CA 3–4688–C.**

United States District Court,
N. D. Texas,
Dallas Division.

Sept. 10, 1973.

Melvyn Carson Bruder, Dallas, Tex., for petitioner.

Henry Wade, Criminal Dist. Atty., John B. Tolle, Asst. Dist. Atty., Dallas, Tex., John L. Hill, Atty. Gen., Roland Daniel Green, III, Asst. Atty. Gen., Austin, Tex., for respondents.

## MEMORANDUM OPINION AND ORDER

WILLIAM M. TAYLOR, Jr., Chief Judge.

A Texas State Court jury convicted Herman Randall of murder with malice on August 5, 1969, and sentenced him to life imprisonment. The Texas Court of Criminal Appeals affirmed,[1] citing two State cases as authority.[2] That Court held—correctly, in my view—that whatever *Miranda*[3] or State law[4] imperfections there may or may not have been in Randall's written confession that was introduced at his trial, he was doomed not by that statement but rather by his own testimony. Taking the stand in flagrant disregard of his counsel's unequivocal warning not to,[5] Randall told the jury not only that he killed his common law wife by hitting her with a board, but also that he previously had been convicted and jailed on three separate occasions for aggravated assault of a female.

Randall now seeks a Federal writ of habeas corpus[6] to spring to freedom from a branch of the "poisonous tree." (The State has agreed that Randall has exhausted his effective State remedies and that the matter is properly before this Court.)

Randall's contentions are more easily understood after the fact situation is reviewed in moderate detail. Two uniformed Dallas, Texas, police officers patrolling in a marked police car received a radioed assignment to investigate a reported "unconscious person" about 1:00 A.M. on March 4, 1969. Finding Randall crouched over his wife's body, the officers asked him to be seated in their car (the weather was cold and rainy). There they questioned him some ten or fifteen minutes. They neither warned him of his rights nor formally arrested him. Besides conducting what might be termed general on-the-scene questioning, the police also learned from Randall where the body had been originally. There they found the murder weapon, which was introduced (erroneously, he contends) at Randall's trial.

The uniformed officers summoned two plainclothes homicide detectives. One of them, Detective Johnson, testified at the examining trial that based on what the officers told him, he formulated the opinion that Randall killed his wife *before* even asking Randall a single question. Not until *after* Randall admitted

---

1. Randall v. State, 464 S.W.2d 836 (Tex.Cr. App.1971).

2. Johnson v. State, 445 S.W.2d 211 (Tex.Cr. App.1969) and Vaughns v. State, 172 Tex. Cr.R. 465, 358 S.W.2d 133 (1962).

3. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. Vernon's Tex.Code Crim.P.Ann. art. 38.22.

5. The record contains this colloquy:

Q: You haven't been advised by both myself and Mr. Bruder that it was not advisable—you have been advised of your right to remain silent?

A: That's correct.

Q: After that advice, you still wish to take the stand?

A: I do.

Just before that exchange, counsel told the trial court:

"The defendant in this case intends to take the stand and testify in his own behalf, and against the advice of counsel; he has been advised of the right to remain silent and he persists in taking the stand to explain the circumstances of this offense with which he's charged." The jury was absent.

6. 28 U.S.C. § 2254.

to Johnson, in Johnson's unmarked police car, that Randall killed his wife did the officer read the *Miranda* warnings to the suspect. A few hours later, at the downtown police station, Randall signed the written statement typed by Johnson (bearing the legend VOLUNTARY STATEMENT in bold letters at the top) that was admitted at trial.

At Randall's pre-indictment examining trial, the justice of the peace sustained Randall's attorney's objection to use of the oral admission. The oral statement was never alluded to at Randall's trial. Following "but for" logic, Randall now would have this Court rule that he would not have given a written confession but for an unlawfully obtained oral admission, and that he would not have testified but for the introduction of what he brands the unlawfully obtained written confession.

This I decline to do, despite the well prepared arguments submitted by Randall's attorney. Instead, I find it clear that Randall's decision to testify, contrary to advice of counsel (advice the correctness of which he now does not challenge), gave the jury sufficient, independent and untainted reason to return its verdict of "guilty."

Randall first argues that it is not—or ought not to be—the law in Texas that a defendant who voluntarily mounts the witness stand thereby waives any preceding error that he otherwise might preserve for appeal.

The first case that the Texas Court of Criminal Appeals cited in its one-page affirmance of Randall's conviction is Johnson v. State, 445 S.W.2d 211 (Tex. Cr.App.1969). There the Court held that the on-the-stand admission of the offense charged, made by a defendant who pleaded guilty in a non-jury case, was sufficient to corroborate the defendant's written statement showing that he committed the offense. The other case is Vaughns v. State, 172 Tex.Cr.R. 465, 358 S.W.2d 133 (1962). There, too, the defendant testified in his own behalf. He contended on appeal his written statement was improperly admitted because he had not been warned of his rights under the Texas predecessor of *Miranda,* Article 727 of the Code of Criminal Procedure. The Court rejected the argument.

Three later cases should resolve any doubt about Texas law on this point. In Mullane v. State, 475 S.W.2d 924 (Tex. Cr.App.1971), the defendant took the stand and testified to all material facts necessary to prove the crime. The Court wrote:

> Where, as here, a defendant, represented by counsel, testifies in his own behalf, we will presume this act to be undertaken voluntarily and with full knowledge of his rights.
>
> \* \* \* \* \* \*
>
> The appellant's judicial confession voluntarily made before the jury would constitute a waiver of any possible error [involving "fruit of the poisonous tree" where the "tree" is an allegedly improperly secured oral confession]. 475 S.W.2d at 926.

It should be noted that in *Mullane,* unlike *Johnson,* the defendant pleaded not guilty.

Again, the Court repeated its stance with vigor in Humphrey v. State, 479 S. W.2d 51 (Tex.Cr.App.1972). There the defendant walked into a police station and excitedly admitted a killing. On appeal, he contended his statement should not have been used against him in evidence because he had not been warned in accordance with State requirements. Rejecting his argument (and citing, among other cases, Randall's own case), the Court said:

> When a defendant testifies to the same facts as contained in his extrajudicial statement, any objection to the admission of the statement is waived. 479 S.W.2d at 53.

Still more recently, in Jones v. State, 484 S.W.2d 745 (Tex.Cr.App.1972) the Court took the same position. There the defendant admitted on the stand that he had some marihuana on him when he was arrested. This admission, the Court

held, waived any right he may have had under State law to have the trial judge submit to the jury a charge on the legality of the search which disclosed the forbidden marihuana.

But Randall goes on, even if his trial was in accord with Texas standards, he was deprived of rights guaranteed by the United States Constitution. He relies principally on two Supreme Court decisions.

Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), a Federal murder prosecution, does have several similarities to Randall's case, but also a number of significant differences. For one thing, the opinion does not make it clear whether the Supreme Court was exercising its supervisory powers over the Federal Court system or was ruling on Constitutional grounds. Secondly, it appears that Harrison took the stand on counsel's advice. Thirdly, the defendant took the stand at his second trial only after the prosecutor read to the jury the defendant's testimony given at his first trial. By the time of the second trial, the Court of Appeals had *determined* that the defendant's confessions had been wrongfully obtained; thus, the earlier testimony had been impelled by improper confessions. Here, Randall *argues* that his written confession was wrongfully obtained and he was impelled to testify, but this is a far different situation from the one in *Harrison*.

Randall also relies on Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L. Ed.2d 171 (1963), a pre-*Miranda* case in which the defendant took the stand after the State introduced certain real evidence. On appeal, the State's highest Court ruled that the evidence had been unlawfully seized under the *Mapp* doctrine, but said the error was harmless. The question for the Supreme Court on certiorari was whether the use of evidence, determined by the State to have been unlawfully seized, *might* have contributed to the conviction. The Court answered the question affirmatively, suggesting that the illegally obtained evidence made other evidence more damaging that it might otherwise have been. The Court noted almost in passing that the defendant had taken the stand; the case did not turn on this point. There is no mention of whether defendant testified over counsel's advice to remain silent.

This Court believes that Randall's decision to testify was in no way impelled by the State's use of his confession; there is no poisoned fruit here. In Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the Court ruled that a questioned confession was not the tainted fruit of an unlawful arrest because the connection between the two was "dissipated" by the passage of several days' time (during which Wong Sun was free on recognizance). Here, although Randall was not free on recognizance or bond, the intervening five months between his arrest and his trial is long enough that it may be assumed he might have carefully weighed the pros and cons of testifying in his own behalf. He apparently was so certain he could convince at least one juror he lacked "malice" as he defined it that he was willing to gamble he was right and his counsel was wrong. The prosecutor's cross-examination of Randall bears out this theory:

Mr. Randall: . . . I'm saying that I'm not guilty of planning on killing somebody; isn't what what you call murder with malice?

Mr. Emerson: That's not exactly the legal definition of malice, Mr. Randall. Are you pleading guilty or not guilty now?

A: I'm responsible for her death.

Q: You killed her.

A: Yes, I killed her.

\* \* \* \* \* \*

Q: Now, let's get down to the heart of the matter. Apparently you admit that you did kill her, now, but you realize, of course, that you got up here and entered a plea of not guilty and said you were not guilty of each

and every element contained within this case.

A: No, I was under the impression that just like I said, that murder with malice means that I wanted to kill her; that I was trying to kill her. That's what I was pleading not guilty to.

Later cross-examination, to Randall's undoubted dismay, revealed to the jury his penchant for aggravated assault that, absent his taking the stand, could not have been mentioned during the guilt-or-innocence phase of the trial. The jury learned that Randall had served sentences of 180 days, 30 days and 75 days for three convictions of aggravated assault, male on female.[7] Randall even corrected the prosecutor as to the details of one of those cases, in which the victim was his wife:

Q: That's the time that you beat her up and hit her in the mouth with a gun and you cut her lip and you knocked out her teeth, isn't that correct?

A: I didn't hit her with a gun, I was walking on crutches, and I hit her with my crutch.

Although his gambit failed utterly and his appeal was equally unavailing, Randall is not content to lie in the bed he made. He now comes, as do ever-increasing numbers of fellow State prisoners, seeking to invoke the Great Writ to undo the damage done by a tactical blunder. We would have a far different question and possibly a different result if Randall had kept his peace, or even if counsel had acquiesced in the decision to testify, so as to preserve for appeal (if convicted) the question of taint from the oral confession. But under the circumstances of this case, where there is absolutely no question of guilt, I agree with the Court of Criminal Appeals that Randall "cannot now be heard to complain" of the use of his written confession.

The petition for writ of habeas corpus is denied.

7. See Vernon's Tex.Pen.Code Ann. art. 1147 (9).