IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 2, 2009 Session

**STATE OF TENNESSEE v. SAMUEL ARMOD WINKFIELD**

**Appeal from the Circuit Court for Madison County**
**No. 07-74    Donald H. Allen, Judge**

_____

**No. W2008-01347-CCA-R3-CD  - Filed March 9, 2010**

_____

Appellant, Samuel Armod Winkfield, was indicted by the Shelby County Grand Jury in January of 2007 for first degree murder, felony murder, especially aggravated kidnapping, tampering with evidence, and conspiracy to tamper with evidence for his role in the death of James Charles Haney, a college student in Jackson, Tennessee.  A mistrial was declared at the conclusion of the first trial in July of 2007.  Appellant was retried in January of 2008.  At the conclusion of the proof, the jury found Appellant guilty of second degree murder and tampering with evidence.  The jury deadlocked on the kidnapping charge.  After a sentencing hearing, Appellant was sentenced to an effective sentence of twenty-five years.  After the denial of a motion for new trial, Appellant initiated the appeal herein.  On appeal, Appellant complains that: (1) the trial court improperly allowed the State to admit Appellant's testimony from the first trial; (2) the evidence was insufficient to support the convictions for second degree murder and tampering with the evidence; (3) the trial court improperly denied the admission of Terrence McGee's MySpace page in which he claimed to be "armed and dangerous;" and (4) the trial court improperly sentenced Appellant to a twenty-five year sentence.  After a thorough review of the record, the judgments of the trial court are affirmed.  We determine: (1) that the former testimony of Appellant was admissible under Tennessee Rule of Evidence 804(b)(1); (2) the trial court properly excluded the MySpace page from evidence; (3) the evidence was sufficient to support Appellant's convictions for second degree murder and tampering with evidence; and (4) under the 2005 amendments to the sentencing act, Appellant cannot appeal the weight given by the trial court to enhancement and mitigating factors.  As a result, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Trial Court are Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

George Morton Googe, District Public Defender and Gregory D. Gookin, Assistant Public Defender, Jackson, Tennessee, for the appellant, Samuel Armod Winkfield.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; Jerry Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General; for the appellee, State of Tennessee.

**OPINION**

On October 19, 2006, Billy England lived at 300 Roland Street in Jackson, Tennessee. Around 10:10 a.m., he was leaving his home and heard what sounded like moaning coming from somewhere nearby. At that time, he saw James Charles Haney, the victim, in the front yard of another residence. Mr. Haney was partially clothed. Mr. England suspected the man was drunk so he told him to go home. Mr. Haney entered the residence at 324 Roland Avenue. Mr. England drove around the block and saw that the front door to 324 Roland Avenue was still open. It was cold and raining, so Mr. England stopped and entered the residence to check on Mr. Haney. When he got inside, Mr. England found Mr. Haney face down on the floor. There were no visible injuries. Mr. England was unable to find a pulse, so he called the police. Mr. England did not hear any gunshots or see anyone else around the neighborhood at that time.

Officers responded to the scene at around 10:18 a.m. Sergeant Buckley Sain of the Jackson Police Department entered the residence and found a "lifeless" Mr. Haney lying face-down on the floor with gunshot wounds to the right leg and chest. Mr. Haney was partially clothed at the time.

According to the medical examiner, the victim died of multiple gunshot wounds. There was no stippling around the wounds, which indicated that the shots were fired from more than three feet away. There was no alcohol or drugs in Mr. Haney's system at the time of his death.

As the investigation unfolded, officers learned that Mr. Haney lived at 324 Roland Avenue with Terrence McGee. Appellant began living with them sometime in September of 2006. The three men were students at Lane College in Jackson. They rented the property from Mundt Rental Properties. At around 8:30 a.m. on the morning of October 19, 2006, Mundt Rental Properties received a telephone call from someone complaining about the trash in front of the house. An employee of Mundt Rental Properties, Teresa Trice, called Mr. McGee's cell phone number at around 10:00 a.m. that morning to tell them to move the trash around to the back of the residence. Ms. Trice did not recognize the voice that answered the phone to be that of Mr. Haney or Mr. McGee. She was assured by the person that answered

the phone that the message would be relayed to Mr. McGee after he got out of class. Ms. Trice remembered that the person who answered the phone was breathing heavily.

According to college records, Appellant received a tuition refund check of more than $1,000 on October 17, 2006. Several weeks prior to the victim's death, Appellant told Mr. McGee that someone was stealing his marijuana. Appellant did not make any accusations at that time to indicate that he thought a specific person was responsible for the thefts.

On October 18, 2006, the night prior to Mr. Haney's death, several people were at the residence at 324 Roland Avenue, including Mr. McGee, Appellant, and Mr. Haney. Mr. McGee and Mr. Haney got into a brief verbal argument because Mr. McGee had failed to pick up the laundry earlier that day. The next morning, October 19, 2006, Mr. McGee arose at around 8:30 a.m. and got ready for class. Several other students had stayed the night at the residence, and Mr. McGee dropped them off at school before going to class. When he left the residence, Mr. Haney and Appellant were the only people present.

Mr. McGee dropped some people off at class and then decided to make a quick trip to get the laundry prior to attending his own class. Mr. McGee got the laundry, then quickly drove home and dropped off the laundry. At that time, Mr. Haney was still asleep on the couch in the living room.

Mr. McGee ended up being about ten minutes late to class because he decided to take the laundry back to the house. Mr. McGee's class was over around 9:50 a.m. At the end of class, he realized that he left his cell phone at home. Mr. McGee borrowed the cell phone of a friend, Joe Elliot, to call his own cell phone. Appellant answered the phone, informed Mr. McGee that something had happened to Mr. Haney, and instructed him to come home. Mr. McGee described Appellant's voice as "scared."

Mr. McGee got into his car and drove quickly home. He pulled up in the alley behind the house, and Appellant ran out the back door carrying a black trash bag and a .380 pistol. It was the same .380 pistol that Mr. McGee had previously given to Mr. Haney. Mr. McGee tried to go inside the house, but Appellant "yanked" him back into the car and informed him "we've got to go." Appellant even pointed the gun at Mr. McGee.

Appellant instructed Mr. McGee to drive the car to his girlfriend's, Ciara Lasley's, apartment. On the way there, Appellant informed Mr. McGee that he was "sorry" but that "[Mr. Haney] kept playing with me, playing with me and testing me and playing with me." Appellant took a stack of money out of his pocket. The money was neatly wrapped in the same manner that the victim kept his money. Appellant denied that he had taken Mr. Haney's money.

-3-

Appellant had exited the residence with Mr. McGee's cell phone. During the car trip to Ms. Lasley's apartment, Appellant used the cell phone several times. He called Ms. Lasley to get directions to her new apartment. Appellant also called someone named "Booky"[1] and told him to "go get [Mr. Haney] he's got two bullets in him."

When they arrived at Ms. Lasley's apartment, Appellant exited the vehicle with the trash bag and the gun. He left the cell phone and told Mr. McGee to keep quiet. Mr. McGee drove to the mall parking lot for about ten to fifteen minutes before returning to campus and attending his remaining classes. Mr. McGee received a call from a friend at around 1:00 p.m. that afternoon informing him that Mr. Haney was dead.

Ms. Lasley recalled receiving a telephone call from Appellant shortly before her 10:00 a.m. class. The call came from Mr. McGee's cell phone. Appellant called her several more times from the phone. Ms. Lasley skipped her 10:00 a.m. class and returned to her apartment to find Appellant and Mr. McGee waiting on her in the parking lot. When she arrived, she did not go to the car but instead went directly into her apartment. Ms. Lasley did not recall if Appellant was carrying anything when he arrived.

Appellant asked Ms. Lasley for a ride to Memphis. She agreed. Ms. Lasley drove Appellant to Memphis and dropped him off at a friend's house before driving back to Jackson.

Nicholas Parks, also known as Booky, was a mutual friend of Appellant, the victim, and Mr. McGee. He received a call on October 19 in the morning. He was asleep when the phone rang but noticed that the phone number was blocked by caller ID. When he answered the phone, a voice instructed him to "go get [Mr. Haney], he has two bullets in him." Mr. Parks ignored the call and went back to sleep.

Cell phone records indicated that Mr. McGee's cell phone received a call from Mundt Rentals at 9:37 a.m. on October 19, 2006. Additionally, Mr. McGee's cell phone made an outgoing call to Ms. Lasley's telephone at 9:42 a.m., received an incoming call from Joe Elliot's cell phone at 9:53 a.m., called Nicholas Park's phone at 10:04 a.m. with the phone number blocked, then made and received several more calls to and from Ms. Lasley's phone, beginning at 10:05 a.m. and concluding at 1:25 p.m.

After the victim's body was discovered and the investigation began, Appellant was located by authorities at his parents' home in Memphis. He was later arrested and indicted for his involvement in the death of the victim.

---

[1]At one point in the transcript, this person is referred to as "Bookie."

After he was arrested, Appellant was incarcerated for a time in the Shelby County Jail while he awaited trial. Larry Futtrell was an inmate in the Shelby County Jail along with Appellant in November of 2006. Appellant told Mr. Futtrell about getting a tuition refund check from Lane College. According to Mr. Futtrell, Appellant used the money to buy some marijuana. Appellant admitted to Mr. Futtrell that he got into a fight with another man for stealing drugs and shot him twice in the stomach with a .380 pistol. Appellant even told Mr. Futtrell that he escaped by exiting through the rear of the residence and later had his girlfriend drive him to Memphis. Mr. Futtrell explained that Appellant had tried to call someone to go check on the victim after the shooting. Appellant was worried about the phone calls that he had made on the morning of the shooting. When Mr. Futtrell came forward with information about the case, authorities had not released any information about the case to the public. In fact, investigators did not learn that Appellant had received a tuition refund check until after talking with Mr. Futtrell.

Appellant was originally tried by a Shelby County Jury in July of 2007. At the conclusion of the State's proof, the jury found Appellant not guilty of felony murder and conspiracy to commit tampering with evidence. At the conclusion of all of the proof, the jury reported that they were deadlocked on the charges of first degree murder, especially aggravated kidnapping, and tampering with the evidence. The trial court declared a mistrial.

Appellant was retried in January of 2008. At that trial, the State introduced Appellant's testimony from the original trial over objection of counsel for Appellant. The trial court ruled that the former testimony was admissible. At the first trial, Appellant testified that he received a refund check from Lane College and used that money to buy some marijuana. On the day of the victim's death, Appellant woke up late after Mr. McGee had already left for school. At that time, the victim was asleep on the couch. Appellant walked to a nearby convenience store to purchase some cigars and ran into Mr. McGee. Appellant caught a ride to school with Mr. McGee, then rode back home. Appellant rolled a cigar and went for a walk. When he returned to the residence, he saw the victim lying on the floor. Appellant claimed that he was scared and went out the back door. Appellant then ran into Mr. McGee, who told him to get into his car. When Appellant got in the car, he saw a .380 pistol on the seat. Appellant's testimony essentially pointed the finger of guilt to Mr. McGee.

At the second trial, Appellant called two witnesses in his behalf. Deidre Robinson and Arsenio Henderson testified that they spent the night at 324 Roland Avenue the night prior to the victim's death. They both recalled a short verbal altercation between Appellant and the victim over the laundry. Neither Ms. Robinson nor Mr. Henderson felt that the argument was a big deal. Mr. Henderson even testified that "they are roommates and they do this all the time. I didn't think nothing of it."

At the conclusion of all of the proof, the jury found Appellant guilty of second degree murder and tampering with evidence. The jury deadlocked on the charge of especially aggravated kidnapping and a mistrial was declared as to that charge.

At a sentencing hearing, the trial court sentenced Appellant to twenty-five years for the second degree murder conviction and six years for the conviction for tampering with the evidence. The trial court ordered the sentences to run concurrently, for a total effective sentence of twenty-five years.

The trial court denied a motion for new trial and this appeal was initiated. On appeal, Appellant has several complaints: (1) the trial court erred by allowing his former testimony to be read into the record; (2) the evidence was insufficient to support the convictions; (3) the trial court erred by excluding the picture and caption entitled "Armed and Dangerous" from Mr. McGee's MySpace page; and (4) the trial court gave Appellant an excessive sentence.

*Analysis*

*Appellant's Prior Testimony as Evidence*

Appellant complains on appeal that the trial court improperly allowed the State to introduce Appellant's testimony from the first trial in their case-in-chief. Specifically, Appellant complains that the introduction of the testimony violates his constitutional rights because he was "stripped" of the ability to decide whether to testify when the trial court allowed the former testimony to be read into evidence. Appellant additionally argues that the "former testimony" exception of Tennessee Rule of Evidence 804 does not apply to a defendant. The State disagrees, citing *Harrison v. United States*, 392 U.S. 219 (1968).

Tennessee Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay statements are generally not allowed into evidence. Tenn. R. Evid. 802. However, the Tennessee Rules of Evidence provide for exceptions to the hearsay rule. *See* Tenn. R. Evid. 803 & 804. These exceptions have been carved out because they "bear sufficient indicia of reliability and trustworthiness to warrant admission." *State v. Henry*, 33 S.W.3d 797, 802 (Tenn. 2000). One such exception when the declarant is unavailable is that the declarant's former testimony may be admissible. Tenn. R. Evid. 804(b)(1). This Court reviews a trial court's ruling whether a witness is unavailable under an abuse of discretion standard. *State v. Summers*, 159 S.W.3d 586, 596 (Tenn. Crim. App. 2004); *Hicks v. State*, 490 S.W.2d 174, 179 (Tenn. Crim. App. 1972).

Unavailability of a witness is defined in Tennessee Rule of Evidence 804. It includes instances in which the declarant:

> (1) is exempted by ruling of the court on the grounds of privilege from testifying concerning the subject matter of the declarant's statement; or
>
> (2) persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so; or
>
> (3) demonstrates a lack of memory of the subject matter of the declarant's statement; or
>
> (4) is unable to be present or to testify at the hearing because of the declarant's death or then existing physical or mental illness or infirmity;
>
> (5) is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance by process; or
>
>     . . . .
>
> A declarant is not unavailable as a witness if exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying. Tenn. R. Evid. 804(a).
>
> "Former testimony" is defined as:
>
> Testimony given as a witness at another hearing of the same or a different proceeding or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination.

*Id.* Former testimony admitted under Rule 804(b)(1) is substantive evidence. *State v. Stacey Philander Baldon*, No. W2000-00524-CCA-R3-CD, 2001 WL 128586, at *5 (Tenn. Crim. App., at Jackson, Feb. 12, 2001), *perm. app. denied* (Tenn. June 4, 2001). It is well-settled that the "invocation of the privilege against self-incrimination renders a witness unavailable." *State v. Howell*, 868 S.W.2d 238, 250 (Tenn. 1993) (citing *State v. Armes*, 607 S.W.2d 234, 237 (Tenn. 1980)).

The State cites *Harrison v. United States*, 392 U.S. 219 (1968), to support their argument that Appellant's testimony from his first trial is admissible herein. In *Harrison*, the defendant was originally tried on a charge of felony murder. At his first trial, the prosecution introduced three confessions allegedly made by defendant while in police custody. After the admission of these confessions, the defendant took the stand and testified to his own version of the events. The jury found the defendant guilty. On appeal, the conviction was reversed when the court determined that the confessions admitted at trial had been illegally obtained. *Id.* at 220. At a second trial, the prosecution did not admit defendant's confessions into evidence, but did read into evidence the defendant's testimony from his first trial. The defendant was convicted again and the conviction was affirmed on appeal. *Id.* at 221. On appeal to the United States Supreme Court, the Court had to decide whether the testimony from the defendant's first trial was properly admitted against the defendant at his second trial. The Court noted that it did not "question the general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings." *Id.* at 222. In so doing, the Court explained,

> [a] defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him.

*Id.* The Court then carved out a narrow exception to the general rule, noting:

> Here, however, the petitioner testified only after the Government had illegally introduced into evidence three confessions, all wrongfully obtained, and the same principle that prohibits the use of confessions so procured also prohibits the use of any testimony impelled thereby-the fruit of the poisonous tree, to invoke a time-worn metaphor . . . .

*Id.*

Because the confessions had been illegally obtained, the Court determined that the relevant question was no longer whether the defendant made a knowing decision to testify, but rather focused on the motivation for the defendant's testimony. *Id.* at 223. The Court held that, if the defendant testified "in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible." *Id.* After stating the general rule, the Court determined that the Government failed to demonstrate that the defendant's decision to testify at his first trial was not motivated by the introduction of the

illegally obtained confessions and, therefore, reversed the defendant's conviction. *Id.* at 224-226. Tennessee has cited *Harrison* with approval in several cases. *See e.g., State v. Valentine*, 8112 S.W.2d 328, 332-33 (Tenn. 1995) (applying *Harrison to* prevent waiver of review of search and seizure issues when the defendant testifies at trial); *State v. Cazes*, 875 S.W.2d 253, 266 (Tenn. 1994) (noting that per *Harrison*, "[a] defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives.").

In the case herein, Appellant testified at the first trial. That trial resulted in a mistrial. During the second trial, the State attempted to call Appellant as a witness. The trial court questioned Appellant, who made the decision not to testify in the second trial. As a result, the trial court declared Appellant unavailable as a witness. The State was then permitted to introduce Appellant's testimony from the first trial under the former testimony exception to the hearsay rule. The testimony was read into the record in front of the jury and certain portions were redacted. At the first trial, unlike the defendant in *Harrison*, Appellant testified of his own free will, not to explain illegally obtained incriminating evidence. In fact, Appellant testified that he had no role in the murder of the victim and had not thrown away any evidence of the crime. In the case herein, the trial court noted that Appellant testified freely at the first trial. We agree with the State that the trial court properly admitted the prior testimony. The State complied with the requirements of Tennessee Rule of Evidence 804 to show that Appellant was unavailable and properly moved to introduce his former testimony. Appellant's former testimony was properly admitted.

*Introduction of MySpace Page as Impeachment Evidence*

Appellant next complains on appeal about the trial court's decision to exclude the introduction of Mr. McGee's MySpace internet page during cross-examination. Appellant filed a motion prior to trial to allow the introduction of a picture of Mr. McGee from his MySpace page that contained a picture of Mr. McGee with the caption "armed and dangerous . . . I repeat armed and dangerous." Counsel for Appellant sought to use the information in an attempt to impeach the credibility of Mr. McGee. On appeal, Appellant specifically argues that the trial court abused its discretion and the exclusion of the evidence amounted to "an unreasonable restriction on Appellant's right to cross-examine" the witness in order to show his lack of credibility. The State disagrees, stating that the trial court properly utilized Rule 608(b) of the Tennessee Rules of Evidence and determined that the information had no probative value and would only serve to confuse the jury.

Tennessee Rule of Evidence 608(b) allows a party to ask a witness about specific instances of conduct that are probative of the witness's untruthfulness in order to attack the credibility of the witness. The trial court must first determine that the alleged conduct has

probative value and that there is a reasonable factual basis for the inquiry. *See* Tenn. R. Evid. 608(b)(1). The trial court must also determine that "the probative value of the evidence, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." Tenn. R. Evid. 608(b)(2). The trial court's ruling will only be disturbed upon a finding of an abuse of discretion. *See State v. Roberts*, 943 S.W.2d 403, 408 (Tenn. Crim. App. 1996), *overruled on other grounds by State v. Ralph*, 6 S.W.3d 251, 257 (Tenn. 1999).

At trial, during the cross-examination of Mr. McGee, counsel for Appellant attempted to enter into evidence a print out from Mr. McGee's MySpace webpage that showed a picture of Mr. McGee with the caption "armed and dangerous." Counsel for Appellant argued that the caption impeached Mr. McGee's testimony in which he claimed that he was afraid of Appellant when Appellant pointed a gun at him. Further, counsel for Appellant argued that the statement impeached Mr. McGee's veracity as a witness because he admitted at the first trial that he was not "armed and dangerous," he only used the statement on his webpage to further his career as a rap artist. The trial court had ruled on the matter at the first trial, deeming the picture and caption inadmissible. The trial court reviewed its ruling from the first trial and again deemed the matter inadmissible. The trial court determined that the probative value of the evidence did not substantially outweigh its prejudicial effect. Further, the trial court did not "believe that [t]his goes to the witness' character for truthfulness or untruthfulness."

The trial court conducted a jury out hearing on the matter and determined that the evidence was not admissible because it was not probative. We determine that the trial court followed the proper procedure and did not abuse its discretion. The statements of a witness on a personal webpage designed to further a musical career are clearly unrelated to any particular instance of conduct that would show the witness's character or reputation for truthfulness as a witness. The trial court properly determined that the evidence was irrelevant and that its probative value was not outweighed by the risk of undue prejudice. This issue is without merit.

*Sufficiency of the Evidence*

Appellant argues that the evidence is insufficient to support his convictions for second degree murder and tampering with the evidence. Specifically, Appellant claims that the testimony of Mr. McGee and Mr. Futtrell was not credible and that he could not be convicted of tampering with evidence because there was no official investigation pending at the time Appellant "allegedly" threw items out of the window of Mr. McGee's car.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered

by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from reweighing or reevaluating the evidence when considering the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

A conviction for second degree murder requires proof that the defendant unlawfully and knowingly killed another. T.C.A. §§ 39-13-201, -210(a). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. T.C.A. § 39-11-302(b). Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence. *State v. Inlow*, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000); *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993). Because second degree murder is a "result-of-conduct" offense, a defendant is guilty if he "acts intentionally, meaning that he acted with a conscious objective or desire to cause the death of the alleged victim." *State v. Page*, 81 S.W.3d 781, 787-88 (Tenn. Crim. App. 2002).

The proof at trial, in a light most favorable to the State, indicated that the victim was unarmed at the time he was shot multiple times. There was testimony from Mr. McGee that Appellant failed to render aid to the victim even after he claimed he knew the victim was shot. Further, there was testimony and cell phone records that indicated someone, presumable Appellant, called Mr. Parks from Mr. McGee's cell phone to report that the victim had "two bullets in him." Mr. Futtrell also testified that Appellant confessed to the murder of the victim while the two were incarcerated in the Shelby County Jail. The jury is

responsible for accessing the credibility of the witnesses. *Pruett*, 788 S.W.2d at 561. The evidence was sufficient to support a conviction for second degree murder.

The elements of tampering with evidence are found at Tennessee Code Annotated section 39-16-503. Tennessee Code Annotated section 39-16-503 states, "(a) It is unlawful for any person, knowing that an investigation or official proceeding is pending or in progress, to: (1) Alter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding . . . ."

At trial, there was testimony that Appellant was in possession of the .380 caliber pistol that was used to shoot the victim, and that pistol was never recovered by police. We determine that the evidence was sufficient to sustain the conviction for tampering with the evidence, *i.e.*, the pistol used to kill the victim. This issue is without merit.

*Sentencing*

Appellant complains that the trial court imposed an excessive sentence. Specifically, Appellant complains that the trial court improperly applied enhancement factors to give him the maximum possible sentence for second degree murder. Appellant does not content that there is no evidence to support the enhancement factors, *i.e.*, that Appellant was on judicial diversion at the time of the offense, a gun was used in the commission of the offense, and Appellant has a history of criminal behavior. Appellant essentially complains about the weight assigned to the enhancement factors by the trial judge.

"When reviewing sentencing issues . . . , the appellate court shall conduct a *de novo* review on the record of the issues. The review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *Ashby*, 823 S.W.2d at 169.

In making its sentencing determination, a trial court, at the conclusion of the sentencing hearing, first determines the range of sentence and then determines the specific sentence and the appropriate combination of sentencing alternatives by considering: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statistical information

provided by the administrative office of the courts regarding sentences for similar offenses, (7) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b), -103(5); *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995). When imposing the sentence within the appropriate sentencing range for the defendant:

> [T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c) (2006).

At the outset we note that Appellant committed the criminal offenses at issue in October of 2006, therefore, the 2005 amendments to the sentencing act apply to our review of his sentencing. The 2005 amendments to the sentencing act made the application of the enhancement factors advisory in nature. *See* T.C.A. § 40-35-114; *State v. Jackie Lynn Gray*, No. M2007-02360-CCA-R3-CD, 2008 WL 2579175, at *5 (Tenn. Crim. App., at Nashville, June 28, 2008), *perm. app. denied*, (Tenn. Dec. 29, 2008); *State v. Troy Sollis*, No. W2007-00688-CCA-R3-CD, 2008 WL 1931688, at *3 (Tenn. Crim. App., at Jackson, May, 2, 2008). In fact, "[T]he 2005 amendments [to the sentencing act] deleted as ground for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors." *State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2008). After a review of the transcript from the sentencing hearing, it is clear that the trial court considered the nature and characteristics of the criminal conduct involved, Appellant's history and background, the mitigating and enhancement factors, and the principles of sentencing. *See id.* at 345-46. The record supports the existence of each applied enhancement factor. The trial court's imposition of a twenty-five year sentence for the felony of second degree murder is affirmed. This issue is without merit.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.


_____
JERRY L. SMITH, JUDGE